UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DAMOND WILSON,                      )
                                    )
            Plaintiff,              )
                                    )
v.                                  )   Civil Action No. 1:10-cv-636
                                    )
UNITED PARCEL SERVICES, INC.,       )
                                    )
            Defendant.              )

### Memorandum Opinion

This matter comes before the Court on Defendant United Parcel Services, Inc.'s ("UPS") Motion for Summary Judgment and Plaintiff Damond Wilson's ("Plaintiff" or "Wilson") Motion to Dismiss Defendant's Motion for Summary Judgment.

Wilson began his employment with UPS in 2004 as a temporary seasonal employee, and in June 2005, Wilson became a full-time package delivery driver for UPS. As a UPS package delivery driver, Wilson was a member of the bargaining unit represented by the Teamsters Union, and the terms and conditions of his employment were governed by the Collective Bargaining Agreement ("CBA") between UPS and the Teamsters Union.

Wilson was assigned to work as a package delivery driver out of UPS's Alexandria, Virginia Building and generally delivered packages to customers in the Arlington, Virginia area. Known as a "cover driver," Wilson did not have an assigned

delivery route but instead covered the routes of UPS's "bid drivers" as needed. Carmine Petrillo ("Mr. Petrillo") supervised Wilson during the relevant timeframe. Mr. Petrillo reported to Pat Wickenhofer ("Ms. Wickenhofer"), UPS's Business Manager for the Arlington, Virginia Center, who in turn reported to Jim Jennings ("Mr. Jennings"), UPS's Division Manager.

Due to the greater volume of deliveries that UPS makes during the holidays, UPS refers to the months of September and December as its "peak season," and every year UPS hires temporary employees to assist its package delivery drivers in making their deliveries during this time. These temporary drivers are known as "driver helpers." These driver helpers generally place several packages from the UPS delivery truck onto a hand cart and then deliver these packages on foot while the package delivery drivers to whom they are assigned complete separate deliveries in the truck.

On December 3, 2007, Mr. Petrillo met up with Wilson while Wilson was making deliveries on his route. Mr. Petrillo explained to Wilson that he had brought some extra packages that he needed Wilson to deliver. The driver helper assisting Wilson on that day was Jerel Scott.

Mr. Petrillo loaded a hand cart with some of the packages that he had brought so that Mr. Scott could deliver the packages on his own. Because it was dark, cold, and windy outside,

Wilson told Mr. Petrillo that he did not think that Mr. Scott should be making the deliveries on his own. Wilson told Mr. Petrillo "that's not how you do a helper." Wilson then insisted that he and Mr. Scott should ride in the delivery truck together to make the deliveries and not have Mr. Scott use the hand cart to make the deliveries on his own. Mr. Petrillo rejected Wilson's plan, explaining that he was Wilson's supervisor and as such, Wilson was to follow his instruction regarding how the helper would deliver the packages.

While Mr. Petrillo and Wilson were engaged in their disagreement over how Mr. Scott would deliver the packages, Mr. Petrillo directed Wilson to arrange or sort the packages loaded on the delivery truck in the manner in which they were to be delivered. Wilson again questioned Mr. Petrillo's direction, arguing that the packages were already sorted as Wilson planned to deliver them to their recipients. Wilson claims that Mr. Petrillo became agitated at him for questioning the instruction and took one of the packages from its placement on the shelf and "tossed" it to another shelf in the delivery truck, telling Wilson to re-sort the package. Wilson contends that at this point Mr. Petrillo told him to "play fetch like a dog" and retrieve the package. Wilson shook his head and refused to re-sort the package.

Following this exchange, Mr. Petrillo telephoned Ms. Wickenhofer to report that Wilson was being insubordinate. Upon overhearing Mr. Petrillo tell Ms. Wickenhofer that Wilson was being "100 percent insubordinate," Wilson exclaimed that "you might as well make it a thousand." Mr. Petrillo then told Ms. Wickenhofer that he was tired of Wilson's behavior, and Ms. Wickenhofer instructed Mr. Petrillo to have Wilson call her on the telephone. Wilson thereafter called Ms. Wickenhofer, who told Wilson that he was to follow Mr. Petrillo's instruction. Wilson attempted to assert his side of the story, but Ms. Wickenhofer repeatedly told Wilson that he was to follow Ms. Wickenhofer's instruction. Wilson responded by telling Ms. Wickenhofer that "I'm not dealing with this," and then hung up the phone. Mr. Petrillo again instructed Wilson to re-sort the packages, and Wilson again refused. Wilson thereafter drove off in his delivery truck to deliver the packages that Mr. Petrillo had brought to him.

Wilson stated that he never had any issues or problems with Ms. Wickenhofer prior to the December 3, 2007 incident and that they had a normal "working relationship." Similarly, Wilson stated that his relationship with Mr. Petrillo prior to December 3, 2007 was nothing out of the ordinary and stated that "[w]e didn't hang out or anything like that. We wasn't BFFs or, you

know, nothing remotely close to that. He was just a member of management and I was the employee."

On December 4, 2007, Wilson was called to a meeting with Mr. Jennings, at which both Mr. Petrillo and Ms. Wickenhoffer were also present. The purpose of the meeting was to discuss Wilson's behavior toward his supervisor the previous day. Wilson had never met with Mr. Jennings prior to the meeting, but Wilson was aware that Mr. Jennings was the Division Manager. Mr. Jennings, like Wilson, is African American.

During the meeting, Wilson was given the opportunity to explain his actions from the previous day. Wilson told Mr. Jennings that he had disagreed with Mr. Petrillo's instruction to re-sort the packages and Mr. Petrillo's instruction to let Wilson's driver helper make deliveries on his own. Upon hearing Wilson's account of his actions, according to Wilson, Mr. Jennings stated that "if your supervisor tells you to do something, then you better do it." In response, Wilson looked at Mr. Jennings and shook his head. Upon seeing this, Mr. Jennings stated that "[t]hat's the problem. That's the problem. If a supervisor tells you to do something, you refuse to do it." In response, Wilson again shook his head in disagreement, and Mr. Jennings thereafter fired Wilson. Following the meeting, Wilson received a termination notice letter signed by Mr. Jennings. The letter stated that Wilson's actions "have given

UPS just cause to discharge you for failure to follow proper methods, procedures and instructions, for your gross insubordination and for your overall unacceptable work record."

On December 5, 2007, Wilson wrote a letter addressed to Michael Eskew, UPS's former Chief Executive Officer, and James Winestock, UPS's Senior Vice President of Operation, complaining that his employment had been unfairly terminated as a result of what he described as Mr. Petrillo's "personal vendetta" against him. In the letter, Wilson mentioned that Mr. Petrillo's treatment of him on December 3, 2007 was "almost racist." However, Wilson did not send this letter to either Mr. Petrillo or Ms. Wickenhofer, and neither of them saw the letter.

Following his December 4 termination, Wilson filed a grievance challenging his termination under the governing CBA. As a result, a local grievance meeting was held on December 14, 2007. Mr. Petrillo, Ms. Wickenhofer, Mr. Jennings, and UPS Labor Manager Eric Bringe were in attendance. Wilson was given an opportunity to explain the actions that resulted in his termination. Mr. Bringe then determined that because Wilson's insubordinate actions constituted his first "major offense," Wilson's termination could be appropriately reduced to a time-served suspension, contingent upon Wilson expressly agreeing to follow management instruction going forward. Mr. Bringe consulted with Mr. Jennings and Ms. Wickenhofer regarding his

determination, and both agreed with the decision to allow Wilson to return to work.

Wilson accepted the determination and signed the UPS Grievance Report Form acknowledging that his termination would be reduced to a time-served suspension based on his express commitment to follow management instruction in the future. Wilson thereafter received a letter from Mr. Jennings confirming the terms of the settlement of his grievance, which stated the following:

> Due to your firm commitment to follow all UPS methods and procedures in the performance of your job responsibilities and conduct yourself in accordance with all UPS policies and guidelines, your discharge . . . has been reduced to a nine (9) day time served suspension. You are to return to work on December 17, 2007.

In accordance with the settlement reducing his termination to a time-served suspension, on December 17, 2007, Wilson returned to work as a package delivery driver at UPS's Alexandria Building. Upon his return to work, Wilson was briefly assigned to deliver packages to the Falls Church, Virginia area. Drivers who deliver packages to that area also work out of the Alexandria Building. This assignment to deliver packages to the Falls Church, Virginia delivery area lasted until around January 1, 2008, with Wilson returning to delivering packages to the Arlington, Virginia delivery area. Wilson explained that he performed satisfactorily during his

temporary assignment and that he was not disciplined in any way during the assignment.

In early February 2008, while he was out delivering packages in Arlington, Virginia, Wilson suffered an injury to his foot after he stepped into a hole while exiting his delivery truck. Because the nature of Wilson's foot injury hampered his ability to drive, thus preventing him from continuing to work as a package delivery driver, UPS provided Wilson with "temporary alternative work" following his injury. This work consisted of scanning packages on UPS's delivery trucks. By mid-March 2008, Wilson had exhausted all "temporary alternative work" available under the CBA, and he then went out on a workers' compensation injury-related leave of absence from work. Wilson remained on this leave of absence until mid-May 2008, at which time he was able to return to work as a package delivery driver.

Following Wilson's return to work, Wilson continued to work as a package delivery driver until September 2008, at which time Wilson claimed that an aggravation of his prior foot injury disabled him from continuing to work. Because of this, Wilson left work on another workers' compensation injury-related leave of absence. Wilson has not yet returned from this leave and claims that, because of his foot injury, he remains unable to work as a package delivery driver.

On June 6, 2008, Wilson filed a charge of discrimination with the EEOC, alleging race discrimination and retaliation in violation of Title VII. Pursuant to a work share agreement with the EEOC, the charge was transferred to the Alexandria, Virginia Office of Human Rights ("AOHR") for investigation. The AOHR investigated Wilson's allegations of race discrimination and retaliation and determined that there was no merit as to either claim. The AOHR found that Wilson's race discrimination claim was without merit because "the evidence does not support the assertions that you were meeting the performance expectations of your employer or that you were treated differently than similarly situated employees outside your protected class." It found that "there is no evidence that you were being treated differently on the basis of your race." Finally, the AOHR stated that Wilson's retaliation claim also failed because "the evidence does not support your claim that you suffered an adverse action after you engaged in protected activity." The EEOC subsequently adopted the findings of the AOHR.

This Court must grant summary judgment when a party fails to make a showing sufficient to establish the existence of any essential element of the party's case on which that party has the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56(c). A movant need only show that there is an absence of evidence or support for

the opposing party's case. See Celotex Corp., 477 U.S. at 325. If the nonmovant fails to identify specific facts that demonstrate a genuine and material issue for trial, then the Court will grant summary judgment "to prevent 'factually unsupported claims and defenses' from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting Celotex Corp., 477 U.S. at 324-25); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) (citing Felty, 818 F.2d at 1128).

As an initial matter, although Wilson bases his race discrimination claim on his termination from employment on December 4, 2007, Wilson filed a grievance based on this termination, which was resolved by UPS agreeing to reduce Wilson's termination to a nine day time-served suspension. This agreement was contingent upon Wilson agreeing to follow management instructions in the future. Thus, Wilson's grievance over his termination was settled to the parties' voluntary agreement. Nonetheless, Wilson contends that his termination was because of his race and in violation of Title VII and 42 U.S.C. § 1981. Because Wilson does not have direct evidence of

race discrimination, he must establish his claim of race discrimination in accordance with the three-step, burden-shifting method articulated by <u>McDonnell Douglas Corp. v. Green</u>, 411, U.S. 792 (1973). Wilson must first establish a prima facie claim of race discrimination. <u>Id</u>. at 802. If Wilson is successful in establishing a prima facie claim, UPS must then articulate a "legitimate, nondiscriminatory" reason for its action. <u>Id</u>. Once UPS articulates such a reason, the presumption of discrimination created by the prima facie claim "drops" from the case. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 142 (2000). The burden then falls back on Wilson to prove that UPS's articulated reason is pretextual and that discrimination was the true reason. <u>McDonnell Douglas</u>, 411 U.S. at 804. "[I]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." Reeves, 530 U.S. at 147 (citations omitted).

To establish a prima facie claim of race discrimination, Wilson must show the following: that (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met UPS's legitimate expectations at the time of the adverse employment action; and (4) similarly situated employees not in his protected class were treated more favorably. <u>See Holland v.</u>

Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007); Baqir v. Principi, 434 F.3d 733, 742 (4th Cir. 2007). First, Wilson cannot establish a prima facie claim of race discrimination because he cannot show that he was performing his job at a level and in a manner that met UPS's legitimate expectations at the time of his termination. His termination was the result of his refusal to take direction from and follow the instructions of his supervisor in regard to how best to utilize his driver helper and how to properly sort packages in his delivery truck. This refusal was compounded by Wilson's defiant behavior at the December 4, 2007 meeting. Wilson admitted that: (1) he engaged in a disagreement with Mr. Petrillo over how to utilize his driver helper; (2) he told Mr. Petrillo "Nah, I'm not doing that" when Mr. Petrillo asked him to re-sort a package; (3) he abruptly hung up on Ms. Wickenhofer when she told him to follow Mr. Petrillo's instruction by telling her "I'm not dealing with this"; and (4) he shook his head in disagreement more than once in response to statements by Mr. Jennings regarding Wilson's need to follow supervisor instructions. Because Wilson cannot show that he was meeting UPS's legitimate expectations at the time he was terminated, he cannot establish the requisite third element of a prima facie claim of race discrimination.

Even if Wilson could establish a prima facie claim of race discrimination, UPS had a legitimate, nondiscriminatory reason

for its action. During the December 4, 2007 meeting to address Wilson's actions on December 3, 2007, Mr. Jennings was informed that Wilson had refused to follow his supervisor, Mr. Petrillo's instructions on how to best utilize his driver helper and sort packages in his deliver truck. Additionally, Wilson shook his head defiantly in response to statements made to him by Mr. Jennings regarding Wilson's need to follow instruction. Mr. Jennings found Wilson's conduct to be insubordinate and therefore had a legitimate, nondiscriminatory reason to terminate Wilson's employment. Because of this, the burden shifts to Wilson to offer sufficient evidence that the articulated reason for his termination is pretextual. Although Wilson may argue that he was not insubordinate, he has no evidence that Mr. Jennings did not honestly believe that Wilson had in fact been insubordinate at the time Mr. Jennings made the termination decision. Because Wilson cannot establish pretext without such evidence, his claim of discriminatory termination must fail. Wilson's own speculation as to why he was terminated is insufficient for this purpose. See Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989) ("[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."). Indeed, when asked whether he knew why Mr. Jennings decided to

terminate him, Wilson replied "I haven't the slightest idea." It is therefore apparent that Wilson is relying on his own speculation as to why he was terminated, which does not constitute evidence. Additionally, Wilson's own subjective belief that he should not have been terminated, or that he was not insubordinate, is irrelevant. See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("[W]e have repeatedly explained that 'it is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff. . . . Accordingly, the plaintiff's 'perception of herself . . . is not relevant.'") (citation omitted).

Without sufficient evidence of pretext, it is not the province of the Court to examine the correctness of UPS's decision to terminate Wilson's employment. See Id. ("[T]his Court 'does not sit as some kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.'"). Finally, Wilson's claim of race discrimination is further undercut by the fact that Mr. Jennings, the Division Manager who made the decision to terminate Wilson, is also African American.

In addition to Wilson's claim of race discrimination, Wilson also brings a claim of retaliation under Title VII against UPS. Wilson bases this claim on the allegations that after he sent a letter to Michael Eskew ("Mr. Eskew"), UPS's

former Chief Executive Officer, and James Winestock ("Mr. Winestock"), UPS's Senior Vice President of Operations, regarding the circumstances of his termination. Wilson complains that he was temporarily assigned to deliver packages to the Falls Church, Virginia delivery area, that Mr. Petrillo and Ms. Wickenhofer accused Wilson of missing scans on packages, that Ms. Wickenhofer told Wilson that he needed to shave and that his uniform was wrinkled, and that Mr. Petrillo once followed Wilson while Wilson performed deliveries. However, Wilson admits that he was not disciplined in any way by UPS following his treutn to work on December 17, 2007.

To establish a prima facie case of retaliation under Title VII, Wilson must demonstrate the following: that (1) he engaged in a protected activity; (2) he thereafter suffered an adverse employment avtion; and (3) there is a causal link between the protected activity and the adverse employment action. See Holland v. Washington Homes, Inc., 487 F.3d 208, 218, (4th Cir. 2007).

Even if Wilson's letter to Mr. Eskew and Mr. Winestock -- which complains of "almost racist" behavior and "a personal vendetta aimed at [Wilson] from Mr. Petrillo for what reason(s) [Wilson has] not been privy to" -- constitutes protected activity for purposes of a Title VII retaliation claim, Wilson is unable to establish a prima facie case of retaliation because

he cannot demonstrate that any of the actions about which he complains were sufficiently adverse. Courts have held that for purposes of establishing a prima facie case of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse. . . ." Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006); Csicsmann v. Sallada, 211 Fed. Appx. 163, 168 (4th Cir. 2006) (explaining that the standard for determining whether an adverse employment action occurred "is still a heavy burden for the plaintiff: the alleged adverse employment action must be material").

First, regarding Wilson's claim that his two-week assignment to work as a package delivery driver for the Falls Church, Virginia area was retaliatory, Wilson admits that he continued to work out of the same UPS facility and that he suffered no loss of pay from this assignment. Second, regarding Wilson's claim that Mr. Petrillo and Ms. Wickenhofer incorrectly accused him of missing scans on delivery packages following his return to work, Wilson again admits that he was not disciplined by UPS following his return to work, and courts have held that oral reprimands, and even written warnings, do not constitute sufficiently adverse employment actions under Title VII. See, e.g., Jackson v. Winter, 497 F.Supp.2d 759, 771 (E.D. Va. 2007) (determining that a written reprimand placed in Plaintiff's

personnel file was not sufficiently adverse for purposes of a Title VII retaliation claim). Third, regarding Wilson's claim that Ms. Wickenhofer once told him that he needed to shave and that his uniform was wrinkled, Wilson again admitted that he was not disciplined by UPS upon his return to work, including for any personal appearance issues. Fourth, regarding Wilson's claim that he was followed on one occasion by Mr. Petrillo while he was performing his deliveries, Wilson admitted that he was not adversely affected by this incident and was in fact told that he had "done a good job" and "did everything right."

Even if Wilson's allegations constituted sufficiently adverse employment actions for purposes of a Title VII retaliation claim, Wilson must still establish a causal connection between the letter complaining about his termination and any of the alleged adverse employment actions. In order to establish such a connection, "the employer must have taken the adverse employment action because the plaintiff engaged in protected activity." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). "[T]he most fundamental requirement for showing a causal link between the protected activity and the adverse employment action is that the decision-maker have knowledge of the employee's protected activity." Cuffee v. Tidewater Community College, 409 F.Supp.2d 709, 721 (E.D. Va. 2006). Indeed, such knowledge "is absolutely

necessary to establish the third element of the prima facie case." <u>Dowe</u>, 145 F.3d at 657. In this case, Wilson did not send this letter to either Mr. Petrillo or Ms. Wickenhofer, but rather to Mr. Eskew and Mr. Winestock, and neither Mr. Petrillo nor Ms. Wickenhofer had knowledge of the letter or any allegation of race discrimination made in the letter. Thus, there is no causal connection between the letter and any alleged adverse employment action.

Finally, even if Wilson could establish a prima facie claim of retaliation, UPS is able to demonstrate legitimate, non-retaliatory reasons for its actions, and Wilson does not have any evidence of pretext. As such, UPS asserts that it needed a driver to cover the Falls Church, Virginia area based on specific need at that time; UPS management reserves the right to appraise the work of package delivery drivers and correct perceived errors; UPS management reserves the right to maintain professional standards among its employees; and UPS management reserves the right to determine whether package delivery drivers follow safety rules and proper delivery and pickup methods.

In addition to UPS's Motion for Summary Judgment, Wilson filed a Motion to Dismiss Defendant's Motion for Summary Judgment. Wilson bases this motion on an allegation that through discovery, UPS did not produce a purportedly "pivotal" letter that he believes would strengthen his case. The

particular letter in question concerns a UPS driver who apparently acted insubordinately toward members of UPS management but was not disciplined as a result of his actions. Wilson contends that he was blindsided and prejudiced by not having received this letter.

However, the evidence shows that Wilson had possession of this letter since at least November 17, 2011, upon which date UPS served its responses to Wilson's First Set of Interrogatories and First Request for the Production of Documents on Wilson. Thus, Wilson possessed the letter for at least as long as he possessed copies of the documents that UPS produced to him in discovery. Further, Mr. Jennings, the individual by whom the letter was apparently received, has stated that he never received this letter, nor does UPS have a record of this other individual ever having submitted a written complaint alleging discrimination. Finally, this letter is not authenticated. In sum, any failure on UPS's part to produce this letter does not serve as a basis for Wilson to avoid summary judgment.

For the foregoing reasons, Defendant's Motion for Summary Judgment should be granted, and Plaintiff's Motion to Dismiss Defendant's Motion for Summary Judgment should be denied. An

appropriate order shall issue.

/s/
Claude M. Hilton
United States District Judge

Alexandria, Virginia
February 7, 2012